NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

YVONNE OLIVER o/b/o S.O.,      :

                           :

      Plaintiff,        :         Hon. Dennis M. Cavanaugh

                           :

      v.             :         **OPINION**

                           :

                           :         Civil Action No: 11-193(DMC)

MICHAEL J. ASTRUE,         :

Commissioner of Social Security,   :

                           :

      Defendant.      :

_____:

DENNIS M. CAVANAUGH, U.S.D.J.:

      This matter comes before the Court upon the appeal of Yvonne Oliver o/b/o S.O. ("Claimant") from the final decision of the Commissioner of Social Security ("Commissioner") denying Claimant's claims for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act") and Claimant's application for supplemental security income under Title XVI of the Act and two decisions of Administrative Law Judge (ALJ) Dennis O'Leary after a First and Second Remand.  This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

      After reviewing the submissions to this Court by both parties, the final decision entered by the ALJ is **affirmed**.

# I.  BACKGROUND
## A.  PROCEDURAL HISTORY

On May 3, 2006, Claimant, the mother of S.O., filed an application for Title XVI Supplemental Security Income benefits on S.O.'s behalf due to asthma and a learning disability. (Tr. 93).  The Claim was initially denied in a Notice of Disapproval dated October 31, 2006. (Tr. 60-62).

Claimant, on behalf of S.O., appealed the Notice of Disapproval by filing a request for Reconsideration dated November 29, 2006.  (Tr. 63).  This appeal was also denied in a Notice of Reconsideration dated June 18, 2006.  (Tr. 64).

Claimant, on behalf of S.O., filed a request for hearing by ALJ on July 11, 2007.  (Tr. 68).  On November 26, 2008, Claimant, with counsel, appeared before ALJ Dennis O'Leary for a hearing on this matter.  ALJ O'Leary issued an Unfavorable Notice of Decision dated December 23, 2008.  (Tr. 17-40).

In the Unfavorable Notice of Decision, ALJ O'Leary made the following Findings of Fact and Conclusions of Law: (1) The Claimant was born on January 2, 2003, therefore, he was an older infant on May 3, 2006, the date the application was filed, and is currently a preschooler (Tr.23); (2) The Claimant has not engaged in substantial gainful activity at any time relevant to this decision (Tr. 23); (3) The Claimant has the following severe impairments: asthma, and speech/language delays (Tr. 23); (4) The Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.33); (5) The Claimant does not have an impairment or combination of impairments that functionally equals the listings (Tr. 34 and Tr. 6).  The Claimant has not been disabled, as defined in the Social Security Act, since May 3, 2006, the

date the application was filed  (Tr. 40).

Counsel submitted a Request for Review of Hearing Decision/Order and a letter to the Appeals Council on February 25, 2009.  (Tr. 15-16, Tr. 164-166).  The Appeals Council denied the request for review on August 10, 2010, thereby rendering ALJ O'Leary's decision the final determination of the Commissioner on the Claimant's claim.  Counsel requested an extension of time to file a civil action, which was granted by the Appeals Council on December 13, 2010. (Tr. 4, Tr. 1).  Claimant then filed an appeal with this Court.

**B.**  **FACTUAL HISTORY**

### 1. Claimant's Medical History and Evidence

#### a. Emergency Room Visits

S.O. was treated at Jersey City Medical Center from May 13, 2003 to May 16, 2003, for bronchiolitis with mild-to-moderate wheezing.  (Tr. 167-75).  At that time, S.O was four months old, and his mother reported that he was not taking any medications.  (Tr. 170).  He was given a Nebulizer treatment with Albuterol in the Emergency Room (ER), which improved his symptoms.  (Tr. 166-70).  The results of a chest x-ray were negative, and he was discharged in stable condition with a prescription for Albuterol via nebulizer.  (Tr. 169-171).

On December 7, 2003, S.O. was treated in the ER at Palisades Medical Center for Viral Syndrome.  (Tr. 176-93).  S.O.'s mother reported that S.O. had been coughing since the day before.  (Tr. 176).  During his evaluation, the doctor noted that S.O. had no wheezing, but had occasional rhonchi.  Id.  A December 7, 2003, chest x-ray revealed clear lungs.  (Tr. 179).  A December 9, 2003, chest x-ray revealed "[l]eft mid-lung subsegmental atelectasis versus early

infiltrate. Hyperinflation." (Tr. 188). S.O. was given Tylenol in the ER and a prescription for

Tylenol. (Tr. 181). The ER doctor advised S.O.'s mother to increase his fluid intake and to use

a humidifier. (Tr. 191).

      On April 3, 2004, S.O. was treated for asthma in the ER at Hackensack University

Medical Center. (Tr. 224). S.O. was given Albuterol/Atrovent via nebulizer, Tylenol for fever,

and Draped 22mg for cough. Id. He was discharged in stable condition with prescriptions for

Albuterol, Prednisone 22 mg, and Tylenol. Id.

      On January 24, 2006, S.O. was treated in the ER at Hackensack University Medical

Center for fever and coughing. (Tr. 198-227). His lungs were clear to auscultation with no

wheezing, rales, or rhonchi. (Tr.209). The results of a chest x-ray were negative. Id. Results of

blood cultures were negative. (Tr. 210). He was given nebulizer therapy (Albuterol), his

symptoms improved, and he was discharged the same day with prescriptions for Tylenol,

Albuterol, and Pulmocort via nebulizer. (Tr.213-16).

### b. Furman Study

      On January 27, 2006, a Developmental Pediatric Study was conducted on S.O. by Jasmin

Furman, M.D., a Developmental Pediatrician at Hackensack University Medical Center Institute

for Child Development. (Tr. 228-30). Dr. Furman reported that S.O., three years old, was being

evaluated for speech and language delays. (Tr. 228). He had a physical examination with

normal results, including a clear chest examination. Id. He was in good overall health. Id. His

father reported no history of tics, seizures, motor mannerisms, or repetitive movements for S.O.

Id. S.O. slept through the night. Id. S.O.'s developmental milestones included: (1) walking by

age one; (2) first words at about age one, and; (3) combining words between ages two and two and one-half.  Id.  He was not yet potty trained and still used diapers.  Id.  He knew how to eat from a spoon and drink from a cup.  Id. He was able to put on his jacket, but required help getting dressed, as he put his clothes on backwards.  Id.

S.O. did not know his colors or "ABC's."  (Tr. 228).  He did not yet know his name or age.  Id.  His eating patterns were anomalous, but he liked pizza, french fries, and ravioli.  Id. He had some chewing difficulties; however, they have recently improved.  Id.  He did not form sentences well.  For example, he responded "Hi, Daddy," "go outside," or "what's that?" when asked to label or name objects.  Id.  His father stated that he understood about 70% of what S.O. said.  Id.  S.O. would say "that" and point to objects he liked.  Id.  He enjoyed playing with toys, such as trucks and cars.  (Tr. 228).  He was isolated when he started preschool, however, he had begun playing nicely with the other children.  Id.  His father reported no history of repetitive movements; however, on occasion, S.O. would repeat what was said to him, as well as repeat the ends of sentences, instead of providing an answer.  (Tr. 228-29).

Dr. Furman utilized the Capute Scales (which identifies developmental delays in children from one to thirty-six months old) and other instruments that measure language abilities, as well as visual motor problem-solving abilities.  S.O. was able to speak in brief phrases.  (Tr. 229).  He would not point to pictures on the picture card.  Id.  He tuned out the examiner.  Id.  He reportedly had been able to identify several body parts, which he would not do on command.  *Id.* He had a vocabulary of at least 50 words.  Id.  His language age equivalent was nineteen and one-half months, with a Clinical Linguistic and Auditory Milestone Scale Developmental

5

Quotient (CLAMSDQ) score of 54.  Id.  He had many immature patterns in the problem-solving

domain.  Id.  When presented with pegs and small items in a pellet bottle, he was able to dump

them spontaneously, but he subsequently placed them in his mouth.  Id.  He also required some

demonstration before he was able to place pegs in a pegboard.  Id.  However, once it was shown

to him, he was able to repeat this activity and completed the form board as well as the pegboard.

Id.  He retrieved objects from behind the Plexiglas screen and demonstrated object permanence.

Id.  His problem-solving age equivalent was twenty-two months.  Id.  He was able to complete

the reverse form board and scribble with a crayon.  Id.  He was unable to draw a person or

identify colors or letters.  Id.  His Clinical Adaptive Test Developmental Quotient (CATDQ)

score was 61.  Id.  The full-scale Developmental Quotient (DQ) score was 58, which is

significantly below age-expectancy and denoted cognitive, problem solving and language

communication deficits.  Id.

### c.  Aichele Examination

On March 14, 2006, Dr. Furman referred S.O. to the Institute for Child Development for

a speech and language assessment by  Paula Aichele, M.A., a speech pathologist.  S.O.'s father

reported that S.O.'s language skills were improving, and S.O. was now beginning to put longer

utterances together.   (Tr. 242).  He had also begun attending preschool five days per week.  Id.

He had no previous history of speech/language evaluations or therapy.  Id.  An audiological

evaluation revealed his hearing was within normal limits in the better ear.  Id.

S.O. was accompanied to the evaluation by his father.   (Tr. 242).  Separation was not

attempted.  Id.  S.O. appeared to be a happy 3-year-old boy.  Id.   Rapport was difficult to

6

establish between S.O. and the examiner.   Id.  S.O. expressed a preference for self-directed

activity over participation in clinician-led tasks.   Id.  He preferred playing with toys of his liking,

rather than those presented by the examiner.   Id.   His eye contact was brief and fleeting.   Id.

He would not accommodate to structured seating, and he preferred to remain standing at a child-

size table or roam about the testing room looking at objects of interest.   Id.   His father provided

the examiner with information regarding S.O.'s functional language abilities.   Id.  Based on the

father's report, observations, and informal tasks, the results of the evaluation were used to

provide a profile of S.O.'s communicative abilities.

S.O.'s receptive language skills were judged to be scattered as compared to age-level

expectations.   (Tr. 242).   His receptive vocabulary consisted of a variety of object labels and

actions.   Id.  He would reportedly identify pictured objects and actions upon request; however,

he could not be successfully encouraged to do so upon request.   Id.  Response to "no" and a firm

vocal tone was characterized by ceasing his actions, "getting quiet," and/or walking away.   Id.

His comprehension of one-step directions without the use of gestural support was reported to be

contingent upon mood.   Id.  His comprehension of two-step directions was neither reported nor

observed.   (Tr. 242-43).   He readily relinquished objects when presented with an open hand and

the verbal directive "give me."  (Tr. 243).   His concept development was reported to include

comprehension of the concepts "on" and "off" only in specific contexts, such as with reference to

the television.   Id.  He reportedly recognized familiar family members by name and would

search for them and familiar objects if they were not within his immediate environment.   Id.   He

demonstrated comprehension of basic "what?" and "who?" questions, as well as "yes/no"

questions.  Id.  He exhibited difficulty with comprehension of the question form "where?"  Id.

He comprehended the statement "show me" better than "where?" to refer to location.  Id.  His

symbolic and representational use of objects was observed.  Id.  The results of the receptive

language profile showed that S.O. had the ability to comprehend location phrases.  Id.  S.O.

displayed weaknesses within the receptive language profile in his ability to complete the

following: (1) comprehend part/whole relationships and the concepts "one and all;" (2) identify

objects by function, and; (3) follow more complex commands including those with two familiar

attributes. Id.

        Play schemes were characterized by representational and symbolic play with toys and

props.   (Tr. 243).   S.O. was observed lining up toys, which was also reported at home.  Id.  S.O.

showed an inability for appropriate turn-taking behaviors during play with the examiner.  Id.  He

turned pages in a book and scanned the pictures.  Id.

         S.O.'s expressive language skills were judged to be below age-level expectations.  (Tr.

243).  His expressive productions included jargon and single words/phrases.  Id.  His echolalic

behaviors were also observed and reported. Id.  He was able to repeat the "main idea" of a

statement produced by his parents.  Id.  S.O. was able to complete rote, scripted speech, as well

as non-contingent utterances during his examination. Id.  However, his father stated that this

was not typically seen at home. Id.  His expressive vocabulary consisted of approximately 50

words, including nouns, verbs, and some pronouns. Id.  His typical mean length of utterances

was up to three words. Id.  Use of the age-appropriate "verb + ing" form was described as

"emerging."  Id.  S.O. was able to satisfy his wants and needs through a combination of

verbalizations (single words) and gestures (pointing/pulling/leading/whole hand extension). Id. He used the phrase "I want [object]," however, this was limited in occurrence. Id. He was observed to state "my" when the examiner attempted to remove a book from the table. Id. He expressed recurrence by stating "more" or "more [object]." Id. His verbal responses to "what?" and "who?" questions were observed. Id. S.O. responded nonverbally to "show me" statements. Id. He would also say "no" when he meant "yes" in response to "yes/no" questions. Id.

He was beginning to utilize language to express physical state. (Tr. 243). For example, he may say "night night" to indicate that he was tired and "I want eat" to indicate that he was hungry. Id. He asked for assistance with objects/activities that he could not manage by stating "open." Id. He had begun to state "pee-pees" and "stinky poo poo" to express a need to be changed. Id. He also had recently begun to state "Daddy, boo boo" when hurt. Id. He called "mommy" or "daddy" to gain his parents' attention. Id. He resisted removal of toys and would "drop to the floor" to protest. Id. He demonstrated short-comings during the expressive language profile in his vocabulary, use of age-appropriate morphological forms (*e.g.*, plurals, possessives, and contractions), use of prepositions, mean length of utterance, and the ability to utilize language to engage in conversation with peers and adults--skills typically seen in a child of his chronological age.

S.O. displayed a closed oral posture with adequate control of oral secretions. (Tr. 243). His observable oral structure and function were deemed adequate to support speech production. Id. He used an infant pacifier until the age of two. Id. He could not be encouraged to imitate

9

oral praxis tasks other than lingual lateralization.  (Tr. 244).  S.O. displayed a jaw slide during lingual lateralization.  Id.  His phoneme development was judged to be appropriate for his age.  Id.  He was a "good eater" who consumed a healthy diet.  Id.  His preferred foods included English muffins, pancakes, french toast, sausage, pizza, french fries, hot dogs, and fish sticks.  Id.  His parents reported that it was difficult to get S.O. to eat meat.  Id.  He would reportedly chew on it for a little bit and then spit it out.  Id.  In addition, he must "feel" his food before he consumed it.  Id.  He  reportedly continued to receive up to two bottles per day.  Id.  He drank additional liquids with a straw.  Id.   There were no concerns relative to his biting/chewing skills or swallowing competency.  Id.

The examiner concluded that the results of the examination indicated moderate receptive and expressive language deficits with qualitative concerns regarding pragmatic language skills.  (Tr. 244).  Specific deficits included weaknesses in vocabulary, mean length of utterance, use of language to express personal needs, and difficulty generalizing learned skills to different contexts.  Id.  He had age-appropriate phonemic development.  Id.  He would benefit from speech and language therapy within the academic setting, and it was strongly recommended that S.O. be enrolled in a preschool program for children with similar communication difficulties.  Id.  School-age children, such as S.O., are encouraged to seek therapeutic services as part of their school program so that therapy goals will focus on developing the vocabulary and communication skills needed to achieve education success, and the speech-language pathologist will have access to the child's curriculum and classroom teacher.  Id.  In many cases, school-age children also benefit from group therapy with same-

aged peers to practice developing their communication and social language skills, which is unavailable in a medical setting.  Id.  S.O.'s prognosis for improvement was positive.  Id.  The duration of intervention was expected to be a minimum of one year.  Id

### d. Sieger Assessment

On May 16, 2006, Deborah M. Sieger, M.Ed., LDT-C, a learning consultant, revealed that S.O.'s overall development was in the borderline range.  Ms. Sieger completed a Pre-Academic Learning Assessment utilizing the Bayley Scales of Infant and Toddler Development – III, and S.O.'s composite score was 75 on the cognitive subtests.  (Tr. 240).  Ms. Sieger reported that he was able to complete the blue and the pink form boards, and he completed the pegboard with ease.  Id.  He was able to stack nine blocks, but he did not imitate the building of a train of cubes.  Id.  He engaged in simple representational play with a doll, cup, spoon and cloth in imitation of the examiner.  Id.  He enjoyed being read to, and he turned the pages as he listened to the story.  Id.  He had difficulty completing a two-piece puzzle.  Id.  He was able to match pictures and colors.  Id.  He did not demonstrate an understanding of the concept of the number one.  Id.

On the language subtests, S.O.'s score was also in the borderline range with a composite Score of 77.  (Tr. 241).  In the area of receptive language, he was able to identify body parts and clothing items.  Id.  He was inconsistent in his ability to identify action in pictures, but he was able to point to pictures when their function was described.  Id.  He did not demonstrate an understanding of pronouns.  Id.  On the expressive-communication subtest, he used a variety of single words, and even a few two-word phrases.  Id.  He imitated the question "Where did it

11

go?" but shortened it to "Where go?"  Id.   Several other phrases that he used included "is picture" and "oh man."  Id.   Several of the single words he used were  intelligible, but his word combinations were difficult to understand.  Id.  He was able to label the action in the two pictures (sleeping and crying), and he used the "ing" form for one of these.  Id.  He did not demonstrate an understanding of size concepts, nor did he produce plurals.  Id.

On the fine-motor subtest, his performance was below average with a scale score of five. Id.  While he was able to use a crayon and imitated horizontal, vertical and circular crayon strokes, he passed the crayon back and forth between two hands and used it with an immature grasp.  Id.   He attempted to string beads and was able to place one bead on the string, but did not complete the sequence to add the others.  Id.   He enjoyed snipping paper with scissors, but did so by holding the scissors with both hands while the examiner held the paper for him.  Id.   He was able to place coins in a slot and was able to unscrew a lid on a bottle.  Id.  He used a neat-pincer grasp with both hands to place Cheerios into a bottle.  Id.

Ms. Sieger concluded that the results of standardized testing indicated delays in S.O.'s acquisition of language and fine motor skills.  Id.  Ms. Sieger felt that he would benefit from participation in a program specifically designed for preschoolers with disabilities.  Id.  She suggested that related services should include individual speech and language therapy and individual occupational therapy.  Id.  A small, structured classroom program would assist him in developing appropriate, school-based behaviors.  Id.

### e.  Schiller Evaluation

On May 23, 2006, Dr. Furman referred S.O. for an occupational therapy evaluation by Felicia Schiller, an occupational therapist.  (Tr. 236-39).   S.O. was three years, four months

12

old, and his development was an area of concern.  (Tr. 236,  238).   He completed a variety of

fine and visual motor skills.  Id.   He tended to transition quickly from some activities and

required encouragement to complete some tasks.  Id.   His attention span and task focus were

variable during one-to-one testing.   Id.   In the sensory motor area, his parents reported that he

was movement-oriented and would often trip and fall.   Id.   His eye contact was variable

during the evaluation.  Id.   He used his left hand more than his right and demonstrated some

midline crossing.   Id.   His construction skills were below average.   Id.   He did not replicate the

four-block train or three-block bridge.   Id.   His graphomotor skills were below average.   Id.

He imitated drawing basic strokes; however, he initially required hand-over-hand assistance to

draw circular scribbles.   Id.   His scissor skills were also below average, and he tended to hold

scissors with his right and left thumbs.   Id.   On the Visual-Motor Integration Test of the

Peabody Developmental Motor Scales, 2nd ed., he scored at the ninth  percentile, which was

below average.  Id.  He repeatedly required assistance to complete most dressing tasks.  Id.   He

appeared to have a mild fine-and-visual-motor-coordination disorder.   Id.   She recommended

individual occupational therapy to address his sensory-motor, fine-motor, visual-motor, and

graphomotor skills.  Id.

### f.  Raha Report

On June 22, 2006, S.O.'s treating pediatrician, Dr. Bandana Raha, reported that S.O. had

been under his care since April 3, 2003, for asthma and speech delay.  (Tr. 194).   Dr. Raha

indicated he had seen S.O. four times in 2005, with the most recent examination on November

30, 2005.  Id.  Dr. Raha reported that S.O. was admitted to the hospital in May 2003 and

December 2003 for wheezing.  Id.  Dr. Raha noted that S.O. was referred for an evaluation to

rule out cystic fibrosis, but Dr. Raha never received a medical report.  Id.  Dr. Raha further

noted that S.O. had a speech delay and was referred for a speech and language evaluation, but

Dr. Raha never received a report.  Id.  Dr. Raha diagnosed speech delay and bronchodilator-

respondent asthma.   (Tr. 195).

### g.  Child Study Team Evaluation

On September 26, 2006, Karen Marge, Ph.D, reported that S.O. underwent a "Child

Study Team" (CST) evaluation by the Garfield CST in May 2006 at the request of his parents.

(Tr. 246-47).   Dr. Marge indicated that S.O. was classified as Preschool Disabled, which

allowed for S.O.'s placement in a full-day, special-education, and self-contained regular school,

with related services in occupational-and-speech-language therapy for 60 minutes a week.  Id.

### h.  Lodi Evaluation

In October 2006, S.O. moved from the Garfield School District to the Lodi School

District.  (Tr. 280-302).   Therefore, an Individualized Education Program (IEP) meeting was

held on November 6, 2006, by the Lodi CST to review S.O.'s current IEP.  Id.  S.O. had delays

in acquisition of language and fine motor skills. (Tr. 285).   His past medical history included

hospitalization at ten months old for a severe respiratory infection with bronchitis, and he had

been placed on a ventilator for approximately two weeks.  Id.  He was taking Albuterol

inhalations as needed.  Id.  He was described as overall immature.  At thirty-six months, his

language-age equivalent was nineteen-and-a-half months.  Id.  His problem-solving age

equivalent was twenty-two months.  Id.  His Developmental Quotient was significantly below

age expectancy, denoting cognitive, problem-solving and language communication deficits.  Id.

His current teacher reported that he was adjusting to his new placement, he did well in group work, and he enjoyed singing.  Id.

He had language difficulties, which impacted his conversational skills.  Id.  S.O. had a strong labeling vocabulary.  Id.  He tended to engage in solitary play and preferred to repeat activities over and over.  Id.  His speech and language therapist reported that she was getting to know him.  Id.  His specific weaknesses included vocabulary, mean length of utterance, use of language to express personal need, and difficulty generalizing learned skills to different contexts.  Id.  His occupational therapist provided goals and objectives tailored for him.  Id.

Based on the Lodi IEP review, the CST determined that S.O. was eligible for special education and related services.  (Tr. 286).  He was designated to attend a preschool disabled program at South Bergen Jointure Commission (SBJC).  Id.

### i.  Malantic Examination

Dr. Cesar Malantic performed a pediatric examination on S.O. on June 30, 2006; and on October 3, 2006, Dr. Malantic examined S.O. for a throat infection, but not for asthma attacks. (Tr. 267-70).  Dr. Malantic reported that S.O. had a history of bronchial asthma, and when he was seen on June 30, 2006, his examination was essentially normal.  (Tr. 267).  Dr. Malantic reported that S.O. was treated for acute pharyngitis on October 3, 2006.  Id.  Dr. Malantic declined to offer an opinion regarding S.O. because he had no record of his physical or mental disability.  (Tr. 268).

### j.  Elfenbein Evaluation

On October 27, 2006, Emanuel Elfenbein, M.D., a pediatric psychiatrist, considered S.O.'s available medical and behavioral evidence and completed a Childhood Disability

15

Evaluation Form, wherein he assessed that S.O. had a "less-than-marked" limitation in the

domains of "Acquiring and Using Information" and "Interacting and Relating with Others."   (Tr.

271-76).

### k.  Fentress Evaluation

On May 18, 2007, S.O. underwent a consultative Speech and Language Evaluation,

conducted by Dr. Erie Fentress, at the request of the Disability Determination Services (DDS).

(Tr. 350- 53).  S.O. was four years, four months old.  (Tr. 350).  She stated that his medical

history was remarkable for asthma, and that his educational history was significant for

classification by the CST.  Id.  He received speech, occupational, and physical therapies at

school.  Id.  He had age-appropriate articulation, voice, and fluency skills.  (Tr. 350-52).   His

attention and behavior were good to fair for approximately twenty-five minutes.  (Tr.351).  A

formal assessment was not completed due to decreased attention and cooperation.  Id.  Dr.

Fentress reported that S.O.'s receptive language skills were within the first percentile for his

age, which indicated a severe impairment in language comprehension.  (R. 352-53).   Dr.

Fentress further noted that although formal scores were not obtained, S.O.'s expressive language

skills were significantly below age-level expectation, but he exhibited relative strengths in the

area of vocabulary identification and labeling.  Id.   His expressive language, including mean

length of utterance, and social language, was significantly below age-level expectations.  Id.

### l.  Ehle Evaluation

On June 12, 2007, S.O.'s occupational therapist, Holly T. Ehle, completed an

Occupational Therapy Report, in which she indicated that S.O. generally transitioned to therapy

without difficulty. (Tr. 364-65). Ms. Ehle noted that S.O.'s attention appeared improved. (Tr. 364). He required repetitive verbal prompts for participation. Id. He displayed fair eye contact when in non-distractible environments, and he generally required close supervision and prompting for working when sitting tabletop for five minutes. Id. He was able to sit quietly for only 15 seconds. Id. He was able to follow one-step directions when they were repeated, but he easily became frustrated with tasks. Id.

He played with an adult and was beginning to play more with peers with prompts. Id. He initiated limited verbalization and was able to make his basic needs known. Id.

In terms of sensory processing and integration, S.O. displayed no adverse reactions to tactile, visual, oral or vestibular tasks. (Tr. 364). He loved all toys with wheels such as cars, trucks, trains, etc. Id. Although somewhat fearful, he did enjoy some movement and vestibular activities. Id. His sensory integration and processing appeared within functional limits given his age. Id.

In the area of gross-motor skills, S.O. demonstrated functional range of movement in the head, neck, trunk, arms and legs. (Tr. 364). His muscle tone and strength were in the average range, which was functional. Id. He demonstrated righting and equilibrium reactions when unexpectedly shifted off balance. Id. His sitting posture in a chair was upright with a neutral pelvic position. Id. He was able to run with arms moving reciprocally, jump with a two-foot take off from a height of twelve inches, kick a ball with his right foot, and hop two to three times on one foot. Id.

17

He could balance for two seconds with postural adjustments on one foot.  Id.  He appeared apprehensive and insecure as he walked forward on a four-inch balance beam; he required hand support.  Id.  He could complete only two steps without hand support when attempting sideways or backwards movements on a balance beam.  Id.  Although he could gallop and pedal a tricycle six to ten feet before he needed verbal prompts of encouragement, he was unable to skip with one foot.  Id.

S.O. had improved and could now walk upstairs and downstairs using a reciprocal step pattern while using the handrail.  Id.  He was independent when maneuvering through doors that swung away from as well as pulled toward him.  Id.  He demonstrated visual motor-ball skills for throwing a large ball five feet.  Id.  He demonstrated a weight shift when throwing. Id.  He could catch a large ball (bounced and thrown from a distance of four to five feet) twenty to thirty percent of the time by using his arms and body.  Id.

In the areas of fine motor skills, S.O. seemed to prefer his left hand for dominant tasks, although he switched to his right hand to cut on occasion.  (Tr. 364).  He tired easily when using his left hand and switched hands every five to seven seconds.  Id.  His grip on a writing utensil varied from a right-static-tripod grasp to a modified quadruped grasp.  Id.  He developed a static-tripod grasp with prompting and the introduction of shortened pencils/crayons.  Id.  He did best with writing/coloring utensils approximately two inches in length.  Id.  He was able to demonstrate a neat-pincer grasp for small pellets when placing pellets into a bottle.  (Tr. 364-65).  He was able to string beads with proper attention.  (Tr. 365).  He was able to snip with maximum assistance for holding paper, rotating paper, and coordinating opening and closing

18

scissors.  Id.  Opening and closing scissors required mobility with the thumb side of his hand, while the pinky-finger side stabilized the hand movement.  Id.  He became easily frustrated with these types of activities.  Id.  Snipping results were imprecise and choppy, with no regard for lines.  Id.

In the areas of visual/perceptual motor skills, S.O. was able to maintain visual fixation for one to three seconds inconsistently.  (Tr. 365).  His eye contact was fleeting and inconsistent, especially when activity was not his own selection. Id.  In the area of visual/perceptual skills, he was able to match and name colors, build a nine-cube tower and imitate three-cube designs with a visual model following three practice trials.  Id.  He spontaneously scribbled independently with circular motions.  Id.  He could imitate and copy vertical, horizontal lines and a circle.  Id.  He was unable to trace but could imitate lines and circle with fair accuracy.  Id.  He knew the spelling of his first name.  Id.  He knew, and was able to point out, basic body parts.  Id.  He could draw a person's head with a poor depiction, but only after a model was provided.  Id.  He was able to complete a four-piece puzzle with moderate assistance, but he could complete a non-interlocking puzzle that was a picture divided in two and three pieces independently.  Id.

In the areas of self-care skills, S.O. was able to unpack his backpack and take off his jacket independently with verbal cues.  (Tr. 365).  He was able to zip and unzip with minimal assistance.  Id.  He was dependent in latching the zipper, but he needed help stabilizing the bottom as he pulled the zipper up.  Id.  He required assistance to button and unbutton medium one-inch buttons on a vest.  Id.  He could independently take off his own shoes and socks. Id.

19

He required minimal assistance with turning socks right side out and putting on his socks and shoes.  Id.  He was toilet-trained and managed his clothing with assistance to snap and button his pants.  Id.  He was able to wash his hands with verbal cues to properly sequence all of the steps.  Id.  He independently fed himself a snack and lunch.  Id.  He required assistance opening snack-bag containers and those with tight lids.  Id.

Ms. Ehle commented that S.O. had made progress this year, however, he continued having various deficits, which impacted his classroom activities.  (Tr. 365).

### m.  Patel Consultation

On July 10, 2007, S.O. was referred for a neurological consultation with pediatric neurologist Dr. Poovi Patel.  (Tr. 371-74).  S.O. was accompanied by his mother to the consultation.  She provided the medical information.  (Tr. 371).

S.O.'s mother gave his treatment history and indicated that he would attend a full-day program with autistic children when school resumed in September 2007.  Id.  S.O. weighed forty-three and one-half pounds and was forty-one inches tall.  (Tr. 373).  He had a normal physical examination.  Id.  He made limited eye contact.  Id.  He displayed hand stereotypes and flapped his hands.  Id.  He uttered jargon-type utterances.  Id.  At other times, he used phrases to indicate his needs.  Id.  He displayed immediate echolalia and perseverative tendencies.  Id.  Dr. Patel's overall impression was a four and one-half year old boy in therapy for a neurological impairment manifesting with clinical features consistent with diagnoses of Autistic Spectrum Disorder and Attention Deficit-Hyperactivity Disorder (ADHD).  Id.

### 2. Claimant's Testimony

Yvonne Oliver, S.O.'s mother, testified at the ALJ hearing on November 26, 2008. S.O. and his attorney, Lea Ashe, were also present.

S.O. applied for disability because of his learning disability.  (Tr. 45).  Oliver stated that S.O. was not speaking when he was two years old.  Id.  Oliver stated that S.O.'s former issues with asthma are now "under control."  (Tr.  46).  Oliver stated that S.O. is hyper (including jumping around and running through rooms), to the extent that S.O. cannot sit still.  (Tr.  47). Oliver has to constantly tell S.O. to look at her and count to three in order for S.O. to complete a task.  Id.  Oliver stated that S.O. knows his address, phone number, and his "ABC's."  (Tr.  47-48).  Oliver stated that S.O. can count up to fourteen.  (Tr.  48).  Oliver stated that S.O. cannot pull his pants up and sometimes puts them on backwards.  Id.  Oliver stated that S.O. does not know how to use zippers or buttons.  Id.  Oliver stated that S.O. still drinks from a bottle.  Id. Oliver stated that it is very hard to get S.O. to do his homework.  (Tr. 49).  Oliver stated that S.O. still claps his hands when he gets excited.  Id.  Oliver stated that S.O. is very organized. (Tr.  50).  Oliver stated that S.O.'s teacher told her that S.O. is very destructive in school.  Id. Oliver stated that S.O. is always focused on what other children are doing in school and sometimes bites or hits them, and Oliver had to speak with S.O's principal several times regarding this matter.  (Tr.  51).  Oliver stated that S.O. is probably going to see a behavioral specialist.  Id.  Oliver stated that S.O.'s teachers have told her that he is progressing in regards to his level of writing and his printing.  Id.  Oliver stated that S.O.'s teacher said that S.O.'s writing

is sloppy as compared to the other children, but is up to his expected capacity.  Id.  Oliver  stated

that S.O. is an only child.  Id.  Oliver stated that she thinks S.O. does well around other children

because she is present.  (Tr.  52).  Oliver stated that S.O. does not like to share his toys and

snatches his toys from other children without verbal communication.  Id.  Oliver stated that S.O.

is very distracting in a classroom setting.  Id.  Oliver stated that S.O. repeatedly says "I can't do

it" in regards to assigned classroom work that he does not want to do.  (Tr.  52-53).  Oliver stated

that S.O. doesn't eat very well. (Tr.  53).  Oliver stated that S.O. will only drink Ovaltine and eat

soup, french fries, pizza, smiles, and Chicken McNuggets from McDonald's.  Id.  Oliver stated

that she has tried to introduce other food to S.O., but S.O. would smell the newly-introduced

food and did not like the food.  Id.  Oliver stated that S.O. is a healthy little boy.  (Tr. 54).

Oliver stated that S.O. is in speech and occupational therapy at school.  Id.  Oliver stated that

S.O. is in Kindergarten.  Id.  S.O. states that he likes homework.  (Tr.  55).  S.O. knew his

teacher's name and stated he liked her.  Id.  S.O. stated he had a friend named Abraham in his

class.  (Tr. 56).  S.O. stated that he wants to play football and that he plays baseball.  Id.

### 3. ALJ's findings

    In the Unfavorable Notice of Decision, ALJ O'Leary made the following Findings of Fact

and Conclusions of Law: (1) The Claimant was born on January 2, 2003, therefore, he was an

older infant on May 3, 2006, the date the application was filed, and is currently a preschooler (20

C.F.R. 416.926a(g)(2)).  (Tr.23); (2) The Claimant has not engaged in substantial gainful activity

at any time relevant to this decision (20 C.F.R. 416.924 (b) and 416.972)).  (Tr. 23); (3) The

Claimant has the following severe impairments: asthma, and speech/language delays (20C.F.R. 416.924 (c)).  (Tr. 23); (4) The Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925 and 416.926).  (Tr.33); (5) The Claimant does not have an impairment or combination of impairments that functionally equals the listings (20 C.F.R. 416.924 (d) and 416.924 (a)).  (Tr. 34 and Tr. 6).  The Claimant has not been disabled, as defined in the Social Security Act, since May 3, 2006, the date the application was filed (20 C.F.R. 416.924 (a)).  (Tr. 40).

## II.   STANDARD OF REVIEW

This Court may review the Commissioner's final decision to determine whether it is supported by substantial evidence in the record and is free of legal error.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Williams v. Sullivan, 970 F.2d 1178,1182 (3d Cir. 1992). The factual findings of the Commissioner may be reviewed only to determine whether the administrative record contains substantial evidence to support the findings.   42 U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999); Hartranft,181 F.3d at 360; Williams, 970 F.2d at 1182.   Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)(omitting internal quotation marks and citation)).   Where substantial evidence in the record supports the Commissioner's findings, the reviewing court must uphold his decision "even if [it] would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); 42 U.S.C. § 405(g).

23

III.   **APPLICABLE LAW**

A.  **STANDARD FOR DISABLED CHILD'S SSI BENEFITS**

The SSI program is a federal program that provides benefits to aged, blind, or disabled

individuals who meet certain statutory income and resource limitations.  42 U.S.C. § 1381.

With respect to claims filed on behalf of children

(i) An individual under the age of 18 shall be considered disabled for the
purposes of this title if that individual has a medically determinable physical or
mental impairment, which results in marked and severe functional limitations,
and which can be expected to result in death or which has lasted or can
be expected to last for a continuous period of not less than 12 months.

(ii) Notwithstanding clause (i), no individual under the age of 18 who
engages in substantial gainful activity . . . may be considered disabled.

42 U.S.C. § 1382c(a)(3)(c).

The Commissioner's regulations define the statutory standard of "marked and severe

functional limitations" in terms of listing-level severity.   20 C.F.R. §§ 416.902, 416.906,

416.926a(a).  The three-step process requires a child to show: (1) that she was not working; (2)

that she had a "severe" impairment or combination of impairments; and (3) that her impairment

or combination of impairments was of listing-level severity, i.e., the impairment(s) met,

medically equaled, or functionally equaled the severity of an impairment in the listings.   *See* 20

C.F.R. § 416.924.  In addition, the regulations provide for a single method for determining

functional equivalence based on domains of functioning.  *See* 20 C.F.R. § 416.926a(b)(1).   A

child's functional limitations are evaluated in the following six domains: (1) Acquiring and using

information; (2) Attending and completing tasks; (3) Interacting and relating with others; (4)

Moving about and manipulating objects; (5) Caring for yourself, and; (6) Health and physical well-being.   20 C.F.R. § 416.926a(b)(1)(i-vi).

A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in: (1) marked limitations in two domains of functioning, or; (2) an extreme limitation in one domain.   See 20 C.F.R. § 416.926(a).  A marked limitation is one that is "more than moderate," but "less than extreme."   20 C.F.R. § 416.926a(e)(2)(i).   It is the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean on a comprehensive test designed to measure ability to function in that domain and her day-to-day functioning in domain-related activities is consistent with that score.   20 C.F.R. § 416.926a(e)(2)(i),(iii).   An extreme limitation is the rate given to the worst limitation. 20 C.F.R. § 416.926a(e)(3)(i).   A child will be found to have an extreme limitation when she has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability to function in that domain, and her day-to-day functioning in domain-related activities is consistent with that score.   20 C.F.R. § 416.926a(e)(3)(iii).

## IV. ANALYSIS

**1. The ALJ's evaluation of S.O.'s Autistic Spectrum Disorder and ADHD and its severity.**

On appeal, Claimant challenges the ALJ's determination that S.O.'s only severe

impairments are asthma and speech and language delays.  (Pl's Br. 14).  Claimant contends that

this determination is not supported by substantial evidence and is an error of law.  Id.

Specifically, Claimant asserts that the ALJ failed to assess the severity and functional limitations

of S.O.'s medically determinable impairments—Autistic Spectrum Disorder and ADHD.  Id.

The claimant asserts that although the ALJ does acknowledge some of the exhibits that indicate

S.O. has Autistic Spectrum Disorder and ADHD, the ALJ still failed to evaluate with respect to

steps two and three of the sequential analysis process whether these medically determinable

impairments were severe; and if so, whether they met, medically equaled, or functionally

equaled the listing.  Id. at 19-20.  The Claimant argues that S.O.'s impairments are severe

because they are more than a slight abnormality or combination of slight abnormalities that

causes more than minimal functional limitations in S.O.'s ability to function independently,

appropriately, and effectively.  Id. at 20.  Claimant contends that although S.O. showed

improvements in his full-day, self-contained classroom for students with Autism Spectrum

Disorder, S.O. still continued to display problems with communication, attention-span, social

skills, and routine and repetitive behaviors.

 The ALJ contends that he did adequately address S.O.'s autism by noting his attendance

in class designated for children with autism, as well as Dr. Patel's assessment of S.O. as a child

with "clinical features consistent with diagnosis of Autistic Spectrum Disorder and ADHD."

(Def. Br. 39).  The ALJ also asserts that S.O. had currently been reevaluated and reclassified as

"communication impaired" as a result of S.O. currently attending a "class room designated for

students on the autism behavior analysis."  The ALJ also noted that S.O. attended both speech

and occupational therapy two times a week, and participated in a group speech session once a week. Id. The ALJ therefore asserted that this was evidence that S.O.'s Autistic Spectrum Disorder and ADHD manifested in speech/language delays, although S.O. had other behavioral problems, which the ALJ claimed were adequately addressed when determining whether S.O. met or medically or functionally equaled a listing.  Id.

Thus, the ALJ did make adequate consideration of S.O.'s Autistic Spectrum Disorder and ADHD.  S.O.'s limitations do not limit him to the extent that they could be considered severe impairments that are more than a slight abnormality or combination of slight abnormalities that causes more than minimal functional limitations in S.O.'s ability to function independently, appropriately and effectively. S.O. has been reexamined and reclassified as "communication impaired," as his condition improves through his classroom speech and occupational therapy.  Therefore, the ALJ did give adequate consideration to S.O.'s Autistic Spectrum Disorder and ADHD and concluded that those impairments are not severe.

**2. The evidence supports the ALJ's conclusion that S.O. did not have an impairment or combination of impairments that functionally equals the listing level.**

The Claimant contends that substantial evidence supports a finding that S.O. has at least a marked limitation in the functional domain of Acquiring and Using Information.  (Pl. Br. 21). Claimant also asserts that there is substantial evidence that S.O. has a marked limitation in the functional domain of "Interacting with Others."  Id. at 28.

The Claimant contends the following:

> Although the ALJ found that S.O. has less-than-marked limitation in "Acquiring and Using Information," the substantial objective medical evidence and school records…clearly demonstrate that S.O. exhibits severe problems indicating a marked limitation, if not an extreme limitation, in this domain of functioning because they interfere seriously, if not very seriously, with S.O.'s ability to independently initiate, sustain, and complete activities.

Id. at 27.

The Claimant also asserts the finding by the ALJ that S.O. had a less-than-marked limitation in the domain of "Acquiring and Using Information" is not supported by substantial evidence, and the matter should be remanded so that the probative evidence in the record can be properly weighed. Id. The Claimant asserts that the ALJ's conclusion that "[t]he claimant has less-than-marked limitation in "Interacting and Relating with Others," due to his speech and language difficulties," contradicts an earlier finding in which the ALJ agreed with the State Agency Doctor that S.O. had marked limitation in "Interacting with Others." Id. at 29-30. The Claimant asserts that the evidence in the record (including the evaluations conducted by Dr. Furman, Dr. Aichele, and Deborah Sieger, M.Ed., the neurological consultation by Dr. Patel, along with S.O.'s responses to ALJ's questioning at the hearing) indicates a finding that S.O. has a marked limitation in the domain of "Interacting and Relating to Others," due to speech and language difficulties. Id. at 30-31.

ALJ contends that substantial evidence supports the ALJ's decision that S.O. has a "less-than-marked" limitation in the domains of "Acquiring and Using Information" and "Interacting and Relating with Others." Id. at 39-40. The ALJ argues that S.O. had a less-than-marked limitation in "Acquiring and Using Information" because S.O. functioned either at an age-appropriate level or just one grade below age-appropriate level. Id. at 43. The ALJ noted this

through an example of S.O.'s most recent teacher's reports, which noted improvement in S.O.'s

schoolwork.  The ALJ's claims were further supported by evidence demonstrated by S.O.'s

social history, his score on the Wechsler Preschool and Primary Scale of Intelligence Test, and

his score on the Bracken Concept Scale.  Id. at 44.  The ALJ claims that S.O. has a less-than-

marked limitation in this domain because the evidence demonstrated that S.O. was motivated to

learn and was demonstrating good progress, even though he demonstrated some difficulties with

acquiring and learning information.  Id. at 45.

 The ALJ also contends that he properly found that S.O. had a less-than-marked limitation in the

domain of "Interacting and Relating to Others," due to his updated school records that noted that

he was able to communicate his needs and his desires to his teachers, he was an active

participant in the classroom setting, he was able to recognize and follow classroom routine on a

daily basis, he was aware of the classroom rules and followed them on most occasions, he was

distracted from the task at hand by outside stimulus, but could easily be refocused, he maintained

eye contact with others for an extended period of time, and he engaged his classmates in social

play.  Id. at 48-50.

The ALJ properly found that S.O. had a less-than-marked limitation in the domain of

"Acquiring and Using Information."  The statute gives guidance in determining the limitation

level through the following non-exhaustive examples:

>  i.  You do not demonstrate understanding of words about space,
>  size, or time; e.g., in/under, big/little, morning/night.
>  ii.  You cannot rhyme words or the sounds in words.
>  iii.  You have difficulty recalling important things you learned in
>  school yesterday.

> iv.   You have difficulty solving mathematics questions   or computing   arithmetic answers.
> v.   You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(3)

The record indicates that S.O. does not have a marked or extreme limitation regarding the above criteria. S.O. is able to perform acts that children without limitations his age can complete. The record also indicates that he has been improving.  S.O. can now play with toys and play dough, is learning to dress himself, responds to instructions, follows classroom rules, is learning numbers and the alphabet, is learning to read and write, and expressively identifies all basic colors, shapes, and cooperates. His teachers have noted improvement in his schoolwork. Although he sometimes functions one grade below an age-appropriate level, this is not an indication of a marked limitation.  Therefore, the ALJ is correct in finding a less-than marked limitation regarding "Acquiring and Using Information."

Additionally, the ALJ properly found that S.O. had a less-than-marked limitation in the domain of "Interacting and Relating to Others."  The statute gives guidance in determining the limitation level through the following non-exhaustive examples:

> (i)   You do not reach out to be picked up and held by your caregiver.
> (ii)  You have no close friends, or your friends are all older or younger than you.
> (iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
> (iv)  You have difficulty playing games or sports with rules.
> (v)   You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.

30

      (vi)   You have difficulty speaking intelligibly or with adequate
      fluency.

20 C.F.R. § 416.926a(i)(3)

      The record shows that S.O. did not have a marked or extreme limitation regarding the above criteria. People of S.O.'s age (age three to six) should be able to socialize with children as well as adults.   <u>See</u> 20 C.F.R.416.926a(i)(2)(iii).   They should begin to prefer playmates their own age and start to develop friendships with children their age.   <u>Id.</u>   They should be able to use words instead of actions to express themselves, and also be better able to share, show affection, and offer help.   <u>Id.</u>   They should be able to relate to caregivers with increasing independence, choose their own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision.   <u>Id.</u>  They should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar.  They should speak clearly enough that both familiar and unfamiliar listeners can understand what they say most of the time.   <u>Id.</u>  The record shows that S.O. was an active participant in almost all classroom settings.  He generally engaged other children during playtime and was able to communicate effectively with his teachers.  His teachers have emphasized his growth and his marked adjustment to his new school district.  Therefore, the ALJ properly found that S.O. had a less-than-marked limitation in the domain of "Interacting and Relating to Others."

    **3. The Appeals Council did not err by not applying the "Whole Child Approach."**

      Finally, Claimant states that the Appeals Council failed to evaluate this matter using the "Whole Child Approach," and such failure is an error of law.  (Pl. Br. 32).

      The Claimant contends that the Appeals Council should have applied the "Whole Child

31

Approach," which came into effect March 19, 2009, in its decision or remanded the matter to the ALJ so that the evidence could be evaluated under this approach. *Id.*

The ALJ contends that the Appeals Council did not apply the "Whole Child Approach" because the Council did not review the case. The Appeals Council denied the request for review, making the ALJ's ruling the final, reviewable decision.

The Appeals Council did not issue the final decision of the Commissioner, and, therefore, the final, reviewable decision is that of the ALJ. Therefore, the 'Whole Child Approach" us not applicable. Therefore, the Claimant's argument that the Appeals Council should have complied with the Social Security 09-1p in its denial of review is without merit.

## V. CONCLUSION

For the reasons stated above, the final decision entered by ALJ O'Leary is **affirmed**. An appropriate order will accompany this opinion.


 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.


Date:          Oct._26__, 2012
Original:      Clerk's Office
cc:            All Counsel of Record